USAO2021R00150/JSK/SG



## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. Georgette Castner |
| | : |
| | : |
| | : |
| v. | : Crim. No. 24-412 |
| | : |
| | : <u>Count One</u> |
| | : 18 U.S.C. § 371 |
| CHRISTOPHER MATTHAEI | : (Securities Fraud Conspiracy) |
| | : |
| | : <u>Counts Two through Seven</u> |
| | : 15 U.S.C. §§ 78j(b) and 78ff |
| | : 17 C.F.R. §§ 240.10b-5 and 240.10b5-2 |
| | : 18 U.S.C. § 2 |
| | : (Securities Fraud) |
| | : |
| | : <u>Count Eight</u> |
| | : 18 U.S.C. § 1348 |
| | : 18 U.S.C. § 2 |
| | : (Securities Fraud) |
| | : |
| | : <u>Count Nine</u> |
| | : 18 U.S.C. § 1349 |
| | : (Securities Fraud Conspiracy) |

## I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at

Newark, charges:

### COUNT ONE
(Securities Fraud Conspiracy)

### Introduction

1.     From in or around May 2020 through in or around February

2021, Defendant CHRISTOPHER MATTHAEI ("MATTHAEI") and his longtime

friend and client, Sean Wygovsky ("Wygovsky") (together, the "Co-Conspirators"),

engaged in an insider trading scheme involving the securities of special purpose

acquisition companies ("SPACs") based on material nonpublic information ("MNPI") that Wygovsky received through his role as a trader at an asset management company. Despite knowing that Wygovsky had a duty to keep that MNPI confidential, and that MATTHAEI and Wygovsky were prohibited from trading on MNPI, MATTHAEI traded in several SPAC securities based on the MNPI he received from Wygovsky, resulting in illicit profits of more than $3.4 million.

## Individuals, Entities and Definitions

2.    At all times relevant to this Indictment:

a.    Defendant MATTHAEI resided in Brielle, New Jersey, and was employed as a partner and senior salesperson at a broker-dealer with offices in Red Bank, New Jersey (the "Broker-Dealer"). MATTHAEI led and managed the Broker-Dealer's Events-Driven Group, which MATTHAEI created in or around 2010. The Events-Driven Group evaluated, among other things, corporate mergers and acquisitions. MATTHAEI's responsibilities included managing client relationships, business development, and sales trading.

b.    Wygovsky, a co-conspirator not charged in this Indictment, resided in Toronto, Canada and was employed as a portfolio manager, securities analyst, and trader at a Canada-based asset management company (the "Asset Management Company"). Wygovsky was a client and close personal friend of MATTHAEI.

c.    SPACs were companies without commercial operations that were formed solely to raise capital through an initial public offering ("IPO") for

2

the purpose of merging with or acquiring a preexisting company. At the time of a SPAC IPO, SPAC shares were typically structured as "units" comprised of common stock and a fraction of a warrant giving investors the right, but not the obligation, to buy or sell shares of a company's stock at a set price during a set period of time. Soon after a SPAC's IPO, the components comprising a SPAC "unit" became separable, so that an investor could trade units, stock, or warrants in the SPAC, which were each listed as separate securities on U.S. securities exchanges.

        d.     SPAC securities were often traded either on the NASDAQ Stock Market ("NASDAQ"), which maintained computer servers in or around Carteret, New Jersey, or the New York Stock Exchange ("NYSE"), which performed trade processing and data services from in or around Mahwah, New Jersey.

        e.     The term private investment in public entity ("PIPE") referred to an asset management fund or large private investor purchasing stock directly from a public company below market price, without those equities being listed for sale on a stock exchange. In the context of SPACs, a PIPE was typically used to help finance the SPAC's acquisition of or merger with a preexisting company.

        f.     SPAC-1 was incorporated as a Delaware corporation on or about November 7, 2018 with its executive offices in Leawood, Kansas. Securities of SPAC-1 were traded on the NYSE.

g.    SPAC-2 was incorporated as a Delaware corporation on or about September 19, 2019 and was headquartered in New York City. Securities of SPAC-2 were traded on the NASDAQ.

h.    SPAC-3 was incorporated as a Delaware corporation on or about September 27, 2019 and headquartered Las Vegas, Nevada. Securities of SPAC-3 were traded on the NYSE.

i.    SPAC-4 was incorporated as a Cayman Islands exempted company on or about January, 24, 2020 and headquartered in New York City. Securities of SPAC-4 were traded on the NASDAQ.

j.    SPAC-5 was incorporated as a Delaware corporation on or about June 16, 2020 and headquartered in Las Vegas, Nevada. Securities of SPAC-5 were traded on the NASDAQ.

k.    SPAC-6 was incorporated as a Delaware corporation on or about March 6, 2020 and headquartered in New York City. Securities of SPAC-6 were traded on the NYSE.

l.    Broker-1 was a financial services company headquartered in San Francisco, California, and later Westlake, Texas, that provided various investment services, including online investing. MATTHAEI maintained an account with Broker-1 (the "Broker-1 Account"), which he used, among other things, to buy and sell securities, including SPACs.

m.    Broker-2 was a brokerage firm based in Omaha, Nebraska that provided online investing services for institutions and individuals.

MATTHAEI maintained a brokerage account with Broker-2 in the name of Edge Harbor LP, an entity that MATTHAEI controlled (the "Broker-2 Account"), which MATTHAEI used, among other things, to buy and sell securities, including SPACs.

n.    Broker-3 was a financial services company based in Menlo Park, California that provided an electronic trading platform accessible via mobile app for trading in securities and other financial services. MATTHAEI maintained an account with Broker-3 (the "Broker-3 Account"), which MATTHAEI used, among other things, to buy and sell securities, including SPACs.

o.    Broker-4 was a brokerage firm based in Greenwich, Connecticut that provided online investing services for institutions and individuals. MATTHAEI maintained a brokerage account with Broker-4 in the name of Edge Harbor LP (the "Broker-4 Account," and together with the Broker-1 Account, the Broker-2 Account, and the Broker-3 Account, the "Personal Brokerage Accounts"), which MATTHAEI used, among other things, to buy and sell securities, including SPACs.

### The Insider Trading Conspiracy

3.    From in or around May 2020 through in or around February 2021, in the District of New Jersey and elsewhere, the defendant,

**CHRISTOPHER MATTHAEI,**

did willfully and knowingly combine, conspire, confederate and agree with Wygovsky and others, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, to use

and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

### Goal of the Insider Trading Conspiracy

4.      The goal of the conspiracy was for MATTHAEI and Wygovsky to engage in an insider trading scheme involving the purchase and sale of SPAC securities based on MNPI that Wygovsky obtained through his position at the Asset Management Company and shared with MATTHAEI, which MATTHAEI then traded on and profited from.

### Manner and Means of the Insider Trading Conspiracy

5.      It was part of the conspiracy that:

#### Wygovsky's Access to MNPI about SPACs

a.      In or around 2020, SPAC activity, including SPAC IPOs and mergers with target companies, increased significantly from prior years, and the Asset Management Company was frequently approached as a potential participant in PIPE financing for those mergers.

6

b.      Also in or around 2020, MATTHAEI and Wygovsky were close friends who had a longstanding personal and professional relationship. Both Wygovsky and the Asset Management Company were clients of MATTHAEI's, who executed trades on their behalf. The Co-Conspirators traveled together with their families on vacations that were largely paid for by MATTHAEI, including before and during the scheme.

c.      In or around early 2020, MATTHAEI's workload in the Broker-Dealer's Event-Driven Group decreased as mergers and acquisitions deals became less frequent due to the COVID-19 pandemic, and MATTHAEI and others in the Event-Driven Group began to spend more time on personal trading, including trading in SPACs.

d.      Also in or around early 2020, based on his role at the Asset Management Company, Wygovsky repeatedly gained access to MNPI that derived from SPACs seeking PIPE financing from the Asset Management Company, thus revealing their non-public intentions or plans to acquire or merge with a specific company. This MNPI belonged to or was received from third parties to which the Asset Management Company owed "a duty of confidence."

e.      Specifically, after the Asset Management Company was solicited to participate as a PIPE investor in such mergers, the Asset Management Company entered into a confidentiality agreement with the SPAC's placement agent, and the SPAC was added to the Asset Management Company's restricted list. The Asset Management Company then sent an email to all of its employees—

7

including Wygovsky—notifying them of the addition of the SPAC to the restricted

list and instructing them to cease trading in the securities of the SPAC. This email

further stated that the Asset Management Company's "restricted list is confidential

and shall not be discussed and/or distributed externally."

    f.  Additionally, prior to the public announcement of a

merger agreement between a SPAC on the Asset Management Company's restricted

list and its respective target company, Wygovsky frequently participated in

roadshow presentations and received additional MNPI in the form of slide decks

describing, among other things, the terms of the proposed merger agreement and

the timing of the announcement of the anticipated merger.

### Overview of MATTHAEI and Wygovsky's Insider Trading Scheme

    g.  In or around early 2020, MATTHAEI made Wygovsky

aware of his interest in trading in SPAC securities.

    h.  As employees of financial services firms, MATTHAEI and

Wygovsky knew that they were prohibited from trading on the basis of MNPI.

Wygovsky received training concerning U.S. insider trading laws and attested that

he would not, among other things, disclose confidential information that he

obtained in connection with his employment, including information belonging to or

received from third parties to which the Asset Management Company owed "a duty

of confidence." Similarly, MATTHAEI attested annually, including on or about

December 16, 2019 and December 23, 2020, that he understood the Broker-Dealer's

insider trading policy, which stated that "no personnel . . . may trade either

personally or on behalf of others or participate directly or indirectly in the trading of any security of any issuer about which the individual possesses [MNPI] at or prior to the time such information is publicly disclosed and available in the marketplace." The Broker-Dealer's policies further provided that that employees were "prohibited from effecting transactions based on knowledge of [MNPI]," and that mergers and acquisitions were considered "material" information.

      i.     Nonetheless, beginning in or around early 2020, Wygovsky began sharing MNPI of restricted-list SPACs with MATTHAEI, including through communications using an encrypted messaging app (the "App") so that the tips would be difficult to trace, expecting that MATTHAEI would trade and profit on this MNPI.

      j.     Based on the tips from Wygovsky, MATTHAEI, while located in the District of New Jersey and elsewhere, executed trades in the SPACs' common stock and warrants in the Personal Brokerage Accounts before the merger agreements between the SPACs and their respective target companies were publicly disclosed.

      k.     MATTHAEI subsequently sold the SPACs' securities for a profit after their respective merger agreements were disclosed to the public and the market reacted to the news.

      l.     MATTHAEI's trading in the securities of SPAC-1, SPAC-2, SPAC-3, SPAC-4, SPAC-5, and SPAC-6, provide examples of the Co-Conspirators scheme.

**Insider Trading Scheme Begins: SPAC-1**

m.    On or about May 27, 2020, the Asset Management Company agreed to negotiate and to keep confidential information concerning a PIPE offering for a merger between SPAC-1 and a corporation that produced electric powertrains for trucks ("Target Company 1"). On or about that same day, Wygovsky received an email from the Asset Management Company's Director of Compliance informing all employees that SPAC-1 had been added to its restricted list, and that trading in SPAC-1 was prohibited.

n.    On or about Thursday, May 28, 2020, at approximately 4:08 p.m. Eastern time,[1] Wygovsky received an email from another Asset Management Company employee stating that they were "over the wall on a SPAC deal," meaning that they had MNPI about that deal. The employee provided SPAC-1's name, stated that it was "contemplating a merger" with Target Company 1, and that there was "an opportunity to buy into the PIPE at $10. We have a meeting set up for Monday at 1pm."

o.    A few hours after receiving this email, Wygovsky tipped MATTHAEI about the SPAC-1 deal using the App.

p.    On or about May 29, 2020—the morning after receiving the tip from Wygovsky—MATTHAEI entered orders to purchase SPAC-1 common stock and warrants in the Personal Brokerage Accounts, including an order to purchase approximately 5,000 shares of common stock of SPAC-1.

---

[1] Unless otherwise indicated, references to specific hours are in Eastern time.

q.    Three days later, on or about June 1, 2020, Wygovsky attended a virtual presentation with Target Company 1 that included MNPI that was relevant to its planned merger with SPAC-1. Contemporaneous with receiving that MNPI, MATTHAEI and Wygovsky had a call at approximately 1:21 p.m., during which Wygovsky shared the MNPI with MATTHAEI.

r.    Minutes later, at approximately 1:28 p.m., MATTHAEI entered a buy order for approximately 5,000 shares of common stock of SPAC-1 in the Broker-2 Account.

s.    MATTHAEI continued to trade in SPAC-1 common stock and warrants using the Personal Brokerage Accounts through on or about June 18, 2020, the day before the public announcement of the merger between SPAC-1 and Target Company 1.

t.    On or about June 19, 2020, at approximately 6:00 a.m., SPAC-1 and Target Company 1 publicly announced their planned merger. Following this announcement, the prices of SPAC-1's common stock and warrants closed up approximately 37.4% and 181.3%, respectively, from the prior day's closing price.

u.    In total, MATTHAEI's illicit trading in SPAC-1 securities generated profits of approximately $1,489,026.

### Insider Trading Continues: St. Barts

v.    On or about June 27, 2020—still in the early days of the COVID-19 pandemic—MATTHAEI, Wygovsky, and their respective families flew on a privately chartered jet to the Caribbean island of Saint Martin and later travelled

to the island of Saint Barthélemy, known as St. Barts. MATTHAEI and Wygovsky

both stayed at, and worked from, the same resort in St. Barts from on or about June

27, 2020 to on or about July 16, 2020. MATTHAEI paid for the private jet and most of

the expenses for Wygovsky and his family during their stay in St. Barts. MATTHAEI

also paid for Wygovsky and his family to fly on a private jet from St. Barts to

Nantucket, Massachusetts on or about August 1, 2020, where MATTHAEI and his

family later joined them for another vacation.

        w.     In or around July 2020, while together in St. Barts,

Wygovsky received MNPI about separate mergers involving other SPACs and their

respective target companies. As with SPAC-1, Wygovsky conveyed MNPI regarding

the SPACs and their potential mergers to MATTHAEI. MATTHAEI then traded on

that MNPI in advance of the public disclosure of the SPACs' merger agreements.

        x.     For example, approximately 40 minutes after Wygovsky

received an email on or about July 9, 2020 informing him that SPAC-2 had been

added to the Asset Management Company's restricted list, MATTHAEI began

entering buy orders for SPAC-2 securities in the Broker-1 Account. Approximately

30 minutes later, MATTHAEI began entering buy orders for SPAC-2 securities in

the Broker-2 Account.

        y.     In addition, approximately 42 minutes after Wygovsky

received an email on or about July 15, 2020 informing him that SPAC-3 had been

added to the Asset Management Company's restricted list, MATTHAEI began

entering buy orders for SPAC-3 securities in the Broker-1 Account.

z.      MATTHAEI subsequently sold SPAC-2 and SPAC-3 securities following the respective public disclosures of these SPACs' merger agreements, thereby generating illicit profits totaling approximately $91,191.

<div align="center">

**MATTHAEI Makes Over $3 Million from
the Insider Trading Scheme**

</div>

aa.     Continuing through in or around early 2021, MATTHAEI frequently traded on MNPI that he received from Wygovsky about potential SPAC mergers with target companies, including merger negotiations involving SPAC-4, SPAC-5, and SPAC-6. MATTHAEI then sold those SPACs' securities following the public disclosure of their respective merger agreements, generating illicit profits.

bb.     In total, from in or around May 2020 through in or around February 2021, MATTHAEI executed and caused to be executed numerous trades in furtherance of the scheme, realizing profits of approximately $3,413,812.

<div align="center">

**Overt Acts**

</div>

6.     In furtherance of the conspiracy and to effect its illegal objects, the following overt acts, among others, were committed and caused to be committed in the District of New Jersey and elsewhere:

a.     On or about May 29, 2020, MATTHAEI entered a buy order for approximately 5,000 shares of SPAC-1 common stock in the Broker-1 Account after receiving MNPI from Wygovsky regarding merger discussions between SPAC-1 and Target Company 1 that was publicly disclosed on or about June 19, 2020.

b.     On or about June 1, 2020 at approximately 1:21 p.m., while Wygovsky was participating in a virtual roadshow presentation relating to SPAC-

<div align="center">13</div>

1's merger with Target Company 1, MATTHAEI and Wygovsky had a call during which MATTHAEI received MNPI from Wygovsky regarding the SPAC-1 merger.

       c.     On or about June 1, 2020 at approximately 1:28 p.m., MATTHAEI entered a buy order for approximately 5,000 shares of SPAC-1 common stock in the Broker-2 Account.

       d.     On or about July 9, 2020, MATTHAEI entered a buy order for approximately 15,000 shares of SPAC-2 common stock in the Broker-1 Account after receiving MNPI from Wygovsky that SPAC-2 had been added to the Asset Management Company's confidential restricted list.

       e.     On or about July 15, 2020, MATTHAEI entered a buy order for approximately 10,000 shares of SPAC-3 common stock in the Broker-1 Account after receiving MNPI from Wygovsky that SPAC-3 had been added to the Asset Management Company's confidential restricted list.

       f.     On or about January 25, 2021, MATTHAEI entered a buy order for approximately 5,000 SPAC-4 warrants in the Broker-1 Account after receiving MNPI from Wygovksy regarding a potential merger between SPAC-4 and a target company that was publicly disclosed on or about January 29, 2021.

       g.     On or about February 2, 2021, MATTHAEI entered a buy order for approximately 5,000 shares of SPAC-5 common stock in the Broker-2 Account after receiving MNPI from Wygovsky regarding a potential merger between SPAC-5 and a target company that was publicly disclosed on or about February 10, 2021.

      h.    On or about February 3, 2021, MATTHAEI entered a buy order for approximately 10,000 shares of SPAC-6 common stock in the Broker-1 Account after receiving MNPI from Wygovsky regarding a potential merger between SPAC-6 and a target company that was publicly disclosed on or about February 12, 2021.

In violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH SEVEN
(Securities Fraud)

2.      The allegations in paragraphs 1, 2, and 4 through 6 of Count

One of this Indictment are realleged here.

3.      On or about the dates set forth below, in the District of New

Jersey and elsewhere, the defendant,

### CHRISTOPHER MATTHAEI,

did willfully, and knowingly, directly and indirectly, by use of the means and

instrumentalities of interstate commerce, and of the mails and the facilities of

national securities exchanges, use and employ, in connection with the purchase and

sale of securities, manipulative and deceptive devices and contrivances, in violation

of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing

devices, schemes, and artifices to defraud; (b) making untrue statements of material

facts and omitting to state material facts necessary in order to make the statements

made, in the light of the circumstances under which they were made, not

misleading; and (c) engaging in acts, practices, and courses of business which

operated and would operate as a fraud and deceit upon persons—that is, by

executing and causing others to execute securities transactions in the below-

referenced SPACs on the basis of MNPI, in breach of a duty of trust and confidence

that was owed directly, indirectly, and derivatively to the issuers of those securities,

the shareholders of the issuers, and to other persons who were the source of the

MNPI, each such transaction constituting a separate count of this Indictment.

16

| COUNT | APPROXIMATE DATE | TRANSACTION |
|---|---|---|
| Two | 5/29/2020 | Buy order for 5,000 shares of common stock of SPAC-1 |
| Three | 7/9/2020 | Buy order for 15,000 shares of common stock of SPAC-2 |
| Four | 7/15/2020 | Buy order for 10,000 shares of common stock of SPAC-3 |
| Five | 1/25/2021 | Buy order for 5,000 SPAC-4 warrants |
| Six | 2/2/2021 | Buy order for 5,000 shares of common stock of SPAC-5 |
| Seven | 2/3/2021 | Buy order for 10,000 shares of common stock of SPAC-6 |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.

## COUNT EIGHT
(Securities Fraud)

1.      The allegations in paragraphs 1, 2, and 4 through 6 of Count One of this Indictment are realleged here.

2.      From in or around May 2020 through in or around February 2021, in the District of New Jersey and elsewhere, the defendant,

### CHRISTOPHER MATTHAEI,

did knowingly and intentionally execute and attempt to execute a scheme and artifice to (a) defraud persons in connection with securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934; (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, that is, by scheming to execute and cause others to execute securities transactions in SPACs on the basis of MNPI.

In violation of Title 18, United States Code, Section 1348 and Section 2.

## COUNT NINE
### (Securities Fraud Conspiracy)

1.      The allegations in paragraphs 1, 2, and 4 through 6 of Count One of this Indictment are realleged here.

2.      From in or around May 2020 through at least in or around February 2021, in the District of New Jersey and elsewhere, the defendant,

## CHRISTOPHER MATTHAEI,

did knowingly and intentionally conspire and agree with Wygovsky and others to commit securities fraud, contrary to Title 18, United States Code, Section 1348.

In violation of Title 18, United States Code, Section 1349.

19

## FORFEITURE ALLEGATIONS

1.      Upon conviction of an offense constituting specified unlawful activity (as defined in Title 18, United States Code, Section 1956(c)(7)), as charged in Counts Two through Eight of this Indictment, or a conspiracy to commit such an offense, as charged in Counts One and Nine of this Indictment, defendant CHRISTOPHER MATTHAEI shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(l)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

## Substitute Assets Provision

2.      If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

        (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third person;

        (c)    has been placed beyond the jurisdiction of the Court;

        (d)    has been substantially diminished in value; or

        (e)    has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c),

to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

A TRUE BILL

[redacted]

Grand Jury Foreperson

PHILIP R. SELLINGER
UNITED STATES ATTORNEY

**CASE NUMBER: 24-412\_\_\_\_\_**

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

**v.**

## CHRISTOPHER MATTHAEI

# INDICTMENT FOR
**18 U.S.C. § 371**
**15 U.S.C. §§ 78j(b) and 78ff**
**17 C.F.R. §§ 240.10b-5 and 240.10b5-2**
**18 U.S.C. § 1348**
**18 U.S.C. § 1349**
**18 U.S.C. § 2**



A True Bill

Foreperson

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

JENNIFER S. KOZAR
SHONTAE GRAY
ASSISTANT U.S. ATTORNEYS
NEWARK, NEW JERSEY